**Clyde E. CLAPPER, Plaintiff,**

v.

**ORIGINAL TRACTOR CAB COMPANY, Incorporated, and Stanley Williams, Defendants.**

**Civ. No. 2255.**

United States District Court
S. D. Indiana,
Indianapolis Division.

Findings of Fact and Conclusions of Law Jan. 13, 1958.

Correcting Entry Jan. 14, 1958.

Memorandum July 9, 1958.

Thomas E. Scofield, Kansas City, Mo., Lockwood, Gault, Woodard & Smith, by Harold R. Woodard, Indianapolis, Ind., for plaintiff.

J. Preston Swecker, Washington, D. C., Kenneth L. Earnest, Rushville, Ind., Linder & Linder by John F. Linder, Indianapolis, Ind., for defendants.

The above entitled cause came on regularly for trial, and the court having duly considered the evidence, together with the post-trial briefs of the parties, the proposed findings of fact and conclusions of law, and the oral argument had thereon, and the court being fully advised in the premises, now makes its findings of fact and conclusions of law by adopting substantially the proposed findings of fact and conclusions of law as submitted by the defendants, with the exception however, of certain amendments and deletions as made by the court in order to more accurately reflect the views of the court in regard to the issues and the evidence pertaining thereto. The court's findings of fact and conclusions of law are therefore as follows:

### Findings of Fact

1. Plaintiff, Clyde E. Clapper, is a resident of near Blue Springs, Missouri.

2. Defendant, Stanley Williams, is a resident of near Arlington, in the County of Rush, State of Indiana.

3. Defendant, Original Tractor Cab Company, Incorporated, is a corporation organized and existing under the laws of the State of Indiana and having its principal place of business at Arlington, Indiana.

4. Plaintiff filed this action under the Patent Laws of the United States, U. S. Code, Title 35, Section 281, to enjoin the defendants from infringing patent No. 2,452,834, granted to the plaintiff on November 2, 1948.

5. The defendant, Original Tractor Cab Company, Incorporated, in answer to the complaint, included a counterclaim for damages claimed to have been caused by the plaintiff and others as a result of violation of the antitrust laws of the United States, under U. S. Code, Title 15, Section 15.

6. Thereafter, the plaintiff filed an amended complaint seeking (1) a declaratory judgment that the defendants were estopped from denying the validity and infringement of the plaintiff's patent and further that the defendants were estopped from charging a violation of the antitrust laws; (2) claiming an infringement of the plaintiff's patent and unfair competition; (3) that the defendants have, for the purpose of deceiving the public, falsely marked articles of manufacture with the patent number of the plaintiff's patent; (4) that the defendants have breached an agreement entered into with the plaintiff; and (5) that the defendants have been unjustly enriched, which latter was dismissed voluntarily by the plaintiff prior to trial.

7. The court has jurisdiction of the parties and of the causes of action presented.

8. All of the causes of action presented by the pleadings between plaintiff and defendants were presented to the court in a trial which consumed twelve full days, and all evidence presented by the parties with respect to all of such issues has been received by the court.

9. Thereafter, briefs were filed on behalf of the plaintiff and defendants, together with proposed findings of fact and conclusions of law. After the post-trial briefs and proposed findings of fact and conclusions of law were filed, the proposed findings of fact and conclusions of law were subjected to oral argument for the benefit of the court.

10. In his briefs, the plaintiff has abandoned the causes of action for unfair competition and false patent marking, and the amended complaint will be dismissed as to these causes of action.

11. In 1945, the plaintiff and one Lee Flora, of Danville, Illinois, separately claimed to have made inventions in tractor covers for deflecting the heat from the engine of the tractor around the operator, and each filed an application for a patent thereon. In 1946, one Michael A. Halligan, of Fort Dodge, Iowa, claiming to have made a like invention, filed an application for a patent thereon.

12. During the pendency of these three patent applications, the Patent Office, recognizing that they claimed substantially the same invention, declared an interference between all three of them, for the purpose of determining priority of invention as to said three patent applicants. It also declared a separate interference between the Flora and Halligan applications on an auxiliary feature of that tractor cover.

13. While his application for patent was pending, Clapper had granted an exclusive license to Bearing Distributors Company to manufacture and sell the tractor cover included in his patent application and the patent to be granted thereon. Later that company's corporate name was changed to Comfort Equipment Company.

14. Flora had granted an exclusive license under his patent application to the Cabette Company, of Danville, Illinois, to manufacture and sell the tractor cover included in his application and the patent to be granted thereon.

15. Halligan likewise had granted an exclusive license to the Fort Dodge Tent & Awning Company to manufacture and sell the tractor cover included in his patent application and the patent to be granted thereon. Later that company's corporate name was changed to Burch Manufacturing Company.

16. After licenses were granted to the above corporations, Comfort began manufacturing and selling tractor covers in 1945 and Burch and Cabette began like operations in 1946, sales being made largely through distributors located throughout substantial portions of the United States.

17. In April, 1948, after the declaration of the aforesaid patent interferences, representatives of the abovenamed licensees and the three named inventors, and their respective attorneys met in Chicago, Illinois, in an effort to settle their differences with respect to priority of invention. At the outset of said meeting and prior to disclosures between themselves of the respective dates of invention, it was agreed by all of the parties there present, or represented by others, that each of the corporate licensees under the then pending patent applications would have a right to a license under each patent application then pending and under any letters patent that might be granted thereon, upon the same terms as granted to the others.

18. Thereafter, at said meeting some evidence of priority of invention was adduced and discussed by the parties, but the discussion was concerned more particularly with the question of royalties to be paid by the respective licensees to the respective patent applicants. At the conclusion of the meeting, although specific agreement was not reached thereon, by reason of the earlier filing date of his patent application, it was generally understood that Clapper should have priority of invention to the basic unit of a tractor heat deflector; that Flora, who was second in point of time in filing his patent application, should have priority as to the part of the tractor cover that surrounds the operator; and that if Halligan had any priority of claim with respect to an invention, it was minimum.

19. The parties were unable to settle at that meeting the question of priority of invention and the amount of royalty to be paid by the respective licensees, and it was agreed that another meeting be held by the interested parties or their representatives to . formulate specific agreements regarding the question of royalties to be paid by the respective licensees to the several patent applicants. Later, two such meetings were held in St. Louis, Missouri, at which the interested parties or their representatives and their attorneys attended. At these meetings in St. Louis, Missouri, various topics were discussed, such as the amount of royalties to be paid, the establishment of a litigation fund, costs of manufacture and the selling price per unit of tractor covers and other related subjects.

20. From the conferences had in said meetings in St. Louis, Missouri, and correspondence later passing between the interested parties, a final meeting was agreed to be held at Des Moines, Iowa, when the License Agreement of August 3–4, 1948, was formally executed by or on behalf of said three aforesaid inventors and their several respective licensees.

21. At that same meeting in August 3–4, 1948, "Priority Award Agreements" were consummated by the three inventors, whereby Clapper was awarded priority of invention on the counts involved in the three-way interference, and Flora was awarded priority of invention on the counts involved in the two-way interference. Thereafter, on November 2, 1948, Clapper was granted Letters Patent No. 2,452,834; and on February 15, 1949, Flora was granted Letters Patent No. 2,461,974. No patent was granted on the Halligan application.

22. By the terms of the License Agreement executed at Des Moines, Iowa, on August 3–4, 1948, the priority of Clapper and Flora to their respective inventions was recognized and agreed upon. Cabette, Fort Dodge and Bearing were each granted a separate license to manufacture and to sell heating units embodying the Flora and Clapper inventions, subject to the following conditions, among others: (1) that the licensees manufacture such heating units "at their respective addresses and in no other place or places except upon written consent" of the owner of the respective patents; (2) that the licensees pay Clapper $1 "as a royalty fee on each and every unit sold and shipped by them" and pay a proportionate royalty on parts, including specifically a royalty of 15¢ on "windshields when sold separately from completed unit"; (3) that the licensees pay Flora 25¢ on each and every unit sold by them, and also a "proportionate royalty" on parts, the same as Clapper; (4) that if any party to the Agreement made, or became the owner of any "improvements in said heating units," then Cabette, Fort Dodge and Bearing could manufacture and sell the improvements without paying any further royalty, except as set forth in paragraph 13 of the Agreement; (5) that Flora and Clapper would not grant any licenses under any patent that may be issued to them, respectively, "or any other patents that might fall within (the) license agreement, without first obtaining the written consent thereto of the remaining parties to (the) Agreement," and each of the licensees agreed not to grant any sub-licenses or any licenses on "any other patent that might fall within (the) License Agreement, without * * * the consent thereto of the remaining parties"; (6) Flora and Halligan agreed to "file applications for Canadian patents" on the subject matter of their respective United States patent applications, and Clapper and Flora granted licenses and the right to "manufacture and sell" heating units under their respective Canadian patent applications "then on file or to be filed"; (7) that if any patent was issued on the "Halligan application" or "any improvement made by Halligan relative to the subject matter of his application" then Bearing and Cabette would have an option "to take a license under such patent" and to pay royalty therefor on equal terms with Fort

Dodge; (8) Sections 13, 14 and 15 of said license agreement read as follows:

"13. In the event any of the claims included in patents that may be issued on said Flora, Clapper or Halligan application, or any patents issued covering any improvements thereon, are infringed or in the event any party to this agreement is sued for infringement for the manufacture of heating units under said patents, then any party to this agreement having knowledge of such infringement or any party to this agreement who is sued for infringement shall send written notice thereof to the remaining parties and within a reasonable time thereafter, not to exceed twenty days, all of the parties hereto agree to discuss said infringements for the purpose of arriving at a mutually agreed upon procedure for their disposition.

"14. To prosecute infringers and defend against infringement, the parties hereto agree to set up a litigation fund of $8,000.00 in the following manner: coincident with the execution of this agreement, Clapper shall pay into the said fund $3,000.00 and Cab-Ette, Fort Dodge and Bearing the sums of $1,000.00 each; that Cab-Ette, Fort Dodge and Bearing shall pay into said fund the additional sum of 5¢ on each heating unit sold by them, respectively, from and after the 1st day of August, 1948, and said Clapper shall pay into said fund the sum of 5¢ for each $1.00 royalty by him received from and after the 1st day of August, 1948, until the funds amount to $8,000.00. That if at any time during the life of this agreement said fund shall be depleted to the sum of $6,000.00, then in any such event, the said parties hereto shall again contribute to said fund at the rate of 5¢ per unit as hereinabove in this paragraph provided, until said fund shall again amount to the sum of $8,000.00. The monies to be paid into said fund

as above provided shall be paid to Clapper, who shall deposit and hold the same in trust in the Commerce Trust Company of Kansas City, Missouri, for the prosecution of infringers and the defending against infringement of any patents because of the manufacture, by Cab-Ette, Fort Dodge, or Bearing of heating units under the above recited patent applications, or patents issuing therefor, or any future patents that may fall within the terms of this agreement. That said funds are to be used for the prosecution of infringements of any of said patents only upon the approval of a majority of the parties to this agreement. That said fund shall also be used to defray the expense that may be necessarily incurred in the investigation of claimed infringements and the necessary correspondence, negotiations and the giving of legal notice of infringement to infringers. That in the event any of the parties to this agreement shall claim an infringement materially affecting their business and shall have given notice thereof to the other parties hereto as provided in paragraph numbered 13 hereof, and a majority of the parties hereto agree that such claimed infringement should be prosecuted, then such prosecution shall be instituted within ninety days, but if a majority of the parties hereto shall fail to give their approval to the prosecution of such an infringement within a period of ninety days after the giving of such notice, then in that event, such party hereto claiming to be materially affected as aforesaid shall have the right and privilege at its own expense to prosecute such infringement without any claim to any of the monies in the said fund in this paragraph provided for, unless such prosecution shall have been finally resolved in favor of the complainant, in which event said complainant shall be entitled to be reimbursed from said fund for their expense

incurred in the prosecution of such infringement. That in the event a majority of the parties agree to the prosecution of any infringement, or to undertake the defense of any claimed infringement by any of the parties hereto, that in any such event, the owner of the patent being infringed shall, and with the aid and advice of the remaining parties hereto if he so chooses, select and engage required counsel. That Clapper shall render unto Cab-Ette, Fort Dodge, and Bearing upon request an itemized statement of all sums, if any, withdrawn from said fund accompanied by a copy of the bank statement thereof. That the liability of Flora, Clapper, and Halligan to prosecute infringements or to defend against infringements shall be limited to the monies in said fund in this numbered paragraph provided for. Upon the termination of this agreement by expiration of the patents issued to Flora and Clapper on U.S. applications 617,049 and 583,345, respectively, or otherwise, or by the mutual consent of the parties, said fund shall be liquidated by dividing among the parties the monies in said fund in proportion to the amounts paid in by said parties as herein provided for.

"15. That in the event a patent shall be issued for improvements upon said heating units to persons other than parties to this agreement, then in such event, it is agreed that the parties hereto shall call a meeting and act as a unit in the negotiation for the use of such improvement, if desired, so as to make the same mutually available and on the same terms to all parties to this agreement, but that if the majority of the parties to the agreement determine not to contract for such improvement, then the parties to this agreement are privileged to contract therefor individually or collectively."

(9) said agreement was "based not only on the patents to be issued on said Clapper or Flora application which (were) the "subject matter of (said) agreement, but also upon those issued upon any renewals, continuations, divisions of, or substitutes for, said applications, and also on any reissues or extensions of said patent or patents"; and (10) that unless otherwise terminated, the licenses granted were to "extend to the latest expiration date of any patent issued on said Clapper and Flora applications."

23. Under the original license that Comfort had from Clapper; Cab-Ette had from Flora; and Burch had from Halligan; and the license agreement executed by plaintiff on August 3–4, 1948, the licensees, Comfort, Cab-Ette and Burch, built up substantial businesses, each doing several million dollars of business, in interstate commerce, manufacturing and selling tractor heating units during the time referred to herein. Each had numerous distributors in this country and Canada. Their collective sales value of tractor covers ranged from $200,000 to over a million dollars a year. Royalties paid to the plaintiff have amounted to over five hundred thousand dollars.

24. Adhering to the agreement of August 3–4, 1948, the licensees and Clapper set up a "Litigation Fund" as therein provided, for the purpose of defraying the expense of investigating and prosecuting infringers and defending against infringements of the Clapper and Flora patents. Said fund continued in existence from 1948 and the parties proceeded to use and control the same jointly as provided in said license agreement until on or about May 6, 1953. On that date the "Litigation Fund" was disbursed to Clapper and Flora, proportionately and the agreement of August 3–4, 1948, was terminated by the execution of a "Termination Agreement" which mainly resulted from a civil anti-trust action instituted against the licensees and Flora and Cab-Ette by the United States in the United States District Court, Western District of Missouri, Western Division, entitled United States v. Bearing Distrib-

utors Company, 11 F.R.D. 591; 18 F. R.D. 228.

25. Thereafter, separate non-exclusive licenses were granted by the patentees, Clapper and Flora, to Burch, Comfort and Cabette, under which these three corporations conducted their business operations in tractor covers, and any and all interim effects of the Agreement of August 3–4, 1948, thereafter ceased to exist on May 6, 1953.

26. On November 24, 1948, plaintiff served notice on the defendant, Original, of infringement of the aforesaid Clapper patent, No. 2,452,834. However, no action was taken immediately against the said defendant.

27. During all of the times herein mentioned, the plaintiff was represented by Mr. Fred M. Roberts, an attorney with offices in Kansas City, Missouri. After consummation of the License Agreement of August 3–4, 1948, and establishment of the litigation fund provided for therein, Roberts, under instructions from Clapper and with full knowledge and understanding of the other parties to the Agreement of August 3–4, 1948, caused the notices of infringement to be sent to the defendant, Original, and to all of the known distributors who were selling tractor covers manufactured by the defendant. Notices of those and other claimed infringements were sent to Roberts by the plaintiff and by the licensees and from various other sources. When knowledge of a claimed infringement was made known to Roberts, he caused infringement notices to be served on the alleged infringers. Copies of said notices were sent to the plaintiff and to the licensees and they were generally informed by Roberts of the giving of said notices of infringement and were consulted from time to time with respect thereto.

28. In August, 1949, a second notice of infringement was sent by Mr. Fred M. Roberts, as attorney for the plaintiff, Clapper, to the defendant, Original, and a number of letters were sent by Roberts to the distributors for the defendant, informing said distributors that the tractor covers manufactured by the defendant, Original, were infringements of Clapper's Letters Patent, whereby the sale thereof by such distributors constituted an infringement, and subjected the said distributors to infringement actions by the said patentee.

29. As a consequence of such infringement notices, the defendant, Original, did cease for a time the manufacture and sale of tractor covers, and also some of the distributors thus notified of infringement also ceased selling tractor covers manufactured by the said defendant and began the sale and distribution of tractor covers manufactured by Comfort Equipment Company; whereby the sale of the tractor covers by the said defendant to the public were thereby directly curtailed and limited.

30. Clapper and Roberts were obligated under Section 13 of the Agreement of August 3–4, 1948 to give notice and to take action against claimed infringement of Clapper's Letters Patent within ninety days after notice thereof was received from the licensees or from any other source, and generally did so by serving notices of infringement. Clapper, as trustee of the litigation fund, built by himself and the licensees, expended $15,288.24 from the litigation fund with the approval of Flora and the licensees, to defray the costs incurred in the giving of infringement notices and the prosecution of infringement actions, including the one here involved instituted against the defendants.

31. After the giving of notice of infringement by the plaintiff to the defendant, Original, the defendants sought a license under the Clapper patent, but all such requests were denied by the plaintiff because of his obligations to Flora and the licensees, parties to the Agreement of August 3–4, 1948.

32. After the notices of infringement were sent by Roberts in August, 1949, to the defendant, Original, and to its distributors as aforesaid, the defendants were invited to a meeting held in Chicago, Illinois, on September 12, 1949, with the plaintiff, together with Flora

and the several licensees under said License Agreement, their representatives and attorneys, for the purpose of discussing the license requested.

33. At the meeting on September 12, 1949, the defendant, Williams, sought to persuade the plaintiff, together with Flora, and representatives of and attorneys for their several licensees, that a license should be granted to the defendant, Original, but such request for a license was rejected by those present acting in concert.

34. The parties to the Agreement of August 3–4, 1948, including the plaintiff, acting through Roberts and through the spokesman for the group at the meeting on September 12, 1949, concertedly acted to stop the defendants from manufacturing and selling tractor covers in infringement of the Clapper patent. The full extent of all economic duress thus imposed by the plaintiff together with Flora and the licensees, the other parties to the said Agreement, in respect to that matter through the giving of notices to the defendant and to its distributors, was that if such claimed infringement was not abated, patent infringement proceedings were imminent.

35. The spokesman for the several parties to the Agreement of August 3–4, 1948, upon rejecting the application of the defendants for a license under the Clapper patent, in the meeting on September 12, 1949, informed the defendants that the defendant, Original, would be given a limited period of time within which to dispose of its stock of tractor covers then in course of manufacture and that if the defendants then ceased the manufacture of tractor covers, no action for patent infringement would be instituted. The evidence does not establish that an agreement was reached between the plaintiff and defendants in that meeting in Chicago on September 12, 1949, or subsequently. Any proposals made to the defendants in that meeting were in furtherance of a conspiracy in violation of antitrust laws, with respect to which the court will elaborate further in subsequent findings herein. Plaintiff has alleged and relies upon the theory that a contract was entered into between the defendants and the several parties to the Agreement of August 3–4, 1948, and that he, plaintiff Clapper, has been damaged as a result of the breach of said contract on the part of the defendants. There is no evidence in the record of damages to the plaintiff flowing from the alleged breach, even if it were assumed that an agreement was reached, which the court does not find.

36. Thereafter, the defendants entered into a working arrangement with Cabette, formed for the use of the Original facilities to manufacture parts of tractor covers for Cabette, which working arrangement became effective the latter part of October, 1949. A proposed contract to formalize the working arrangement was reduced to a writing dated November 4, 1949. Before the execution thereof by both parties, disagreement arose, and the proposed contract was not executed. The working arrangement was terminated by mutual consent. A proposed settlement contract dated November 23, 1949, was prepared. Before the execution by both parties, a controversy arose, and the contract was unexecuted by both parties.

37. The defendants prior to the filing of ·this action by the plaintiff, had no knowledge of the terms and provisions of the License Agreement of August 3–4, 1948, except with respect to the place of manufacture of the tractor covers with the permission of Clapper.

38. The defendants discontinued the manufacture and sale of the Original products and entered into a working arrangement with Cabette. This arrangement was made in order to afford Cabette the working facilities of Original whereby Original could manufacture parts for Cabette, and at the same time, it was a means of keeping Original in operation.

39. During the working arrangement between Cabette and the defendants, the defendants notified the plaintiff that they were discontinuing the manufacture and sale of tractor covers in accordance with

the direction by the spokesman for the group at the meeting in Chicago, as aforesaid, on September 12, 1949, which notice was retracted, however, after the discontinuance of the working arrangement with Cabette in November, 1949.

40. During the working arrangement with Cabette, the defendants operated only as suppliers for Cabette by direction of the latter and did not thereby become licensees under the Clapper patent nor parties to the conspiracy; whereby the defendants are not estopped from contesting the validity of the Clapper patent nor from claiming damages for violation of the antitrust laws, according to the first cause of action of the amended complaint.

41. Thereafter, upon the insistence of the licensee, Comfort, a meeting of the parties to the License Agreement of August 3–4, 1948, was held early in the year 1950, to determine what course of action should be followed with respect to the claimed infringement by the defendants; and subsequently, in accordance with an understanding reached by the parties to the Agreement of August 3–4, 1948, at that meeting, this action was instituted in April, 1950, claiming infringement of the Clapper and Flora patents. Thereafter, this action was dismissed as to the Flora patent.

42. The Clapper patent application was filed March 17, 1945, on which patent No. 2,452,834 was granted on November 2, 1948.

43. This patent disclosed a conventional farm tractor, indicated generally at 10 in Fig. 1, with a rear deflector member 44 (Fig. 1) extending over the superstructure 26 of the tractor and down along opposite sides of the operator's station at the seat 30. The rear open side of the deflector 44 is supported by a bow 36 (Fig. 7), adapted to be mounted on the rear axle housing 20 of the tractor and extending upward in front of the operator on the seat 30. A separate front deflector member 88 extends on opposite sides of the engine 22 of the tractor and down beneath the bottom of the engine as an extension of the deflector, so as to increase the supply of heat to the operator when needed. This deflector 88 is removable for the purpose described in the patent of varying the amount of heat to be supplied to the operator (see column 3, lines 55–56). The Clapper hot air deflector takes advantage of the known principle that the fan of the tractor would blow air over the engine during operation and be heated thereby, which heated air is then channeled back to the region of the operator.

44. All of the claims of the patent define the combination of the tractor 10, deflector 44 and bow 36. None of the claims define a hot air deflector comprising just the deflector and bow. In view of the limitations of the statute (U.S.Code, Title 35, Section 112), if a patentable invention is to be found, it must be in the combination of the parts referred to comprising the tractor, deflector and bow.

45. Some of the claims in suit include the detachable front deflector 88 which is removable to adjust the amount of air supplied to the operator, and others include the windshield 72 which is detachably mounted on the bow in front of the operator. These are parts of the deflector structure but do not affect materially the combination claimed.

46. An examination of the file wrapper of the application for the Clapper patent reveals that the examiner called attention to a defect in the application as filed, that such application did not disclose

"a full description of the continuous passage through which warm air may flow from the engine to reach the seat area."

The application was thereafter amended by inserting a description of the passageway 23 and the application of that numeral 23 to the drawings, but the additional disclosure thus incorporated in the application constituted new matter which was not a part of the application as filed. Consequently, no reliance can be placed, in the claim for patentability of the combination, on the parts that

channel the heat of the engine back to the operator.

47. Furthermore, it was shown by the evidence that many tractors have walls between the engine and the operator. In some instances it is necessary to use blocks or brackets to hold the canvas off away from various parts of the structure so as to allow channeling of the heat from the engine to the operator. There was no disclosure of such provisions needed for a practical application of this heat deflector, without which the public could not practice the invention as required for a complete disclosure, according to Section 112 of the Patent Law (U.S.Code, Title 35).

48. Beginning in the early days of the automobile, it has been conventional practice to channel the heat from the engine to the region of the operator. Examples of that principle are found in Standish, No. 1,287,495, and in Weiland, No. 1,988,875, as applied to a tractor.

49. Several of the patents disclose the application of a canopy or cowl section to a vehicle, such, for example, as White, No. 1,020,336, Lorton, No. 1,-083,108, Nobel, British No. 2641/05, Carew-Gibson, British No. 23,286/05, and Winet, Swiss No. 112,135. Disregarding the claim of channeling the heat from the engine through the deflector or cowl section to the operator, as we must, since this was not disclosed in the Clapper patent application as filed, the full combination in a motor vehicle of an engine, cowl section and frame or supporting means, is found in all of these patents.

50. Evidence was submitted also of the manufacture and sale of heat deflectors for tractors by the Colorado Tent & Awning Company and the Denver Tent & Awning Company, both located in Denver, Colorado, by the Duluth Tent & Awning Company, Duluth, Minnesota, and by Sears, Roebuck & Company, several years prior to the date when Clapper claims to have made his device, and more than a year prior to the filing of his patent application.

51. Contemporaneous records were produced, especially of the Colorado Tent & Awning Company, disclosing not only the use of a canvas deflector and metal bow or frame for supporting the same on the tractor, but also by photograph and description contained in advertising material, showing clearly the use of substantially the same structure as incorporated in the Clapper patent and for the same purpose claimed here, namely, to channel the heat of the engine back to the driver of the vehicle. This material fully supports the claimed anticipation of the Clapper heat deflector, as prior knowledge, prior public use or prior sale, under the patent statute.

52. Substantially the same form of tractor cover as made by Colorado Tent Company, was included also in the proofs of manufacture and sale (thereof) by Denver Tent & Awning Company and by Duluth Tent & Awning Company. The proofs as to all of these confirm that such tractor covers, with a metal bow or frame for supporting the same on the tractor, were being made and sold as early as 1941 by these several companies and that they had the effect, when aplied to the tractors, of channeling the heat of the engine back to the operator. For the most part, they were sold for Caterpillar type of tractors, but the Clapper patent makes no distinction as to the type of tractor. All of these tractor covers also included side panels for embracing opposite sides of the engine and connected with the cowl section to increase the quantity of heat supplied to the operator where needed.

53. In 1938, Sears, Roebuck & Company started the sale of a tractor cover which was termed a "windshield" and which comprised a canvas cowl member or deflector substantially like that shown in the Clapper patent and also supported on a tractor by a metal bow, substantially identical with that shown in the Clapper patent. The evidence shows that this had the effect of channeling the heat of the engine back to the region of the operator and that it was sold for several years, as long as Sears, Roebuck & Company were selling the Graham-Bradley tractors, all long prior to the date when

Clapper claims to have conceived of his idea, and more than a year prior to the date of his patent application (U.S.Code, Title 35, Section 102).

54. The evidence shows, and the Court so finds, that the construction of a heat deflector for channeling the heat of the engine back to the operator of a tractor, and mounting it by a bow or metal frame on the tractor, would have been obvious to a person skilled in the art, at a date when Clapper claims to have made his invention.

55. The fact that almost identical devices were conceived by the several patent applicants, Clapper, Flora and Halligan, at about the same time, and apparently without knowledge of the developments of each other, is corroborative of the inescapable conclusion that this was an obvious adaptation, and that it did not amount to a patentable invention.

56. In any event, Clapper's contribution clearly lacked patentable merit as a combination. Every element was old in the prior art, the tractor, the heat deflector or cowl section of canvas, and the metal bow or frame. The manner of use of these in combination was what would have been expected in putting them together in the manner set forth in the Clapper patent. This is the type of device which is unpatentable as a combination, because the combination was not new nor the elements individually.

57. Since the Clapper patent is invalid, as indicated above, the question of infringement is moot. There can be no infringement of an invalid patent.

58. Moreover, this Clapper patent has been used as a basis for an agreement in restraint of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Such misuse of patent rights bars any recovery for patent infringement.

59. By the Agreement of August 3-4, 1948, the patentees, Clapper and Flora, granted a non-exclusive and non-transferrable license to Comfort, Cabette and Burch to manufacture and sell tractor covers. The limitations imposed on the licensees by said Agreement, that the licensees would manufacture the inventions "at their respective * * * named addresses and in no other place or places"; and that no other license would be granted "without obtaining the written consent thereto of the remaining parties to the Agreement"; that if a license so granted was terminated, as provided in Paragraph 8 thereof, Flora or Clapper, respectively, shall be at liberty to license other licensees; that the parties would "mutually agree upon procedure for the disposition" of infringement suits; and that the parties set up a "litigation fund" to be used for that purpose, all are elements of illegality when used for an illegal purpose, as they were.

60. An agreement by a patentee which gives a non-exclusive licensee a veto power in the selection of other licensees is invalid according to Sherman Act standards, Sections 1 and 2.

61. The Agreement is also violative of Section 2 of the Act, in that it manifests an attempt to monopolize by the combining of non-competing patents in the single agreement by competitors and gives to the parties to the agreement veto power over patent rights that are not referrable to their individual businesses, the patents or licenses granted, and this is true even though the licensees may have continued to compete with each other in the manufacture and sale of tractor covers after the execution thereof. They were jointly given an exclusive market and control thereover by the terms of said Agreement, and not singularly as a consequence of patent privileges acquired.

62. By Section 13 of the Agreement, the parties agreed to and the evidence establishes that they did act jointly in respect to "infringements" of the letters patent in question, and "mutually agree upon procedure for their disposition." In Section 14, Clapper and the licensees set up a "Litigation Fund" to be used for the prosecution of infringements of both said letters patent, upon approval

of a majority of the parties to the agreement, and the evidence is that said fund was actually used by them for that purpose. The clear intent of the parties, gleaned from the verbiage contained in paragraphs 13 and 14, supra, and from the evidence herein was giving to each party thereto a separate and collective right to bring and control infringement actions, when no such right or power legally existed in the licensees, or opposite patentee, so to do under patent law; that they jointly and cooperatively intended to and did unite in the prosecution, and use of the "Litigation Fund" for that purpose. The action of the parties as revealed by the evidence is that they did, pursuant to the said agreement, join hands, through Roberts, in the giving of infringement notices to defendant and its dealers, and in so doing they intended to curtail and ultimately stop the manufacture and distribution of tractor covers by defendants, and sale thereof by defendants' distributors.

63. The evidence clearly establishes that the licensees were the major manufacturers of tractor covers and held a dominant position in that field of interstate trade and commerce, and that if the Agreement of August 4, 1948, was carried out by the parties, according to its terms, as it was, that the monopoly granted to said licensees gave them virtual control of that market and made it impossible for defendants to obtain any rights under the patents in issue, or legitimately enter the field of manufacturing and selling tractor covers. It is the fact of combination and concert of action by the parties to do the very things that they claim they had a right to do under said agreement, collectively and jointly, that spells out unlawful use of patent monopoly by them, in violation of Sections 1 and 2 of the Sherman Act.

64. It is no defense of the Agreement of August 4, 1948, or for the giving of infringement notices and bringing of the infringement action as mentioned above, to say that Clapper and Flora had the right to grant separate licenses to defendants and that said patentees had the right under patent law to give notices of infringements of their respective patents, and to bring infringement actions. It is conceded that such are legal rights accruing to a patentee, or his assign or assigns. But what may be legally done by a patentee, or his assign, singularly or collectively, is no criterion for the measurement of legality of the agreement of August 4, 1948, and what was actually done by the plaintiff and his licensees in furtherance thereof as shown by the evidence. What Clapper, or Flora, separately, might legally have done and what was done by them in concert of action with each other and with the licensees herein are two different matters. The fact that concert of action, violative of the Sherman Act, is accomplished by legal means, does not remove the terminal result thereof from the prohibitions of the Act.

65. A conspiracy or combination having as its object, or effect, a restraint of interstate trade and commerce, whether accomplished by legal or illegal means, falls within the ambit of Sections 1 and 2 of the Sherman Act and is condemned thereby. Patent rights give no protection from the prohibition of the Sherman Act, when they are asserted, controlled, or used in consequence of an agreement that is in restraint of interstate trade or commerce. Cf. United States v. New Wrinkle, Inc., 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417. When two individual patentees combine their patent monopolies and contract between themselves and with their licensees to secure mutual benefits for themselves and their licensees that are not given to them by the patent laws, and which agreement gives to the opposite patentee and the licensees a right of control over patent rights that may be asserted, and is used in restraint of interstate trade and commerce, the purpose and result of such an arrangement and conduct is clearly in violation of Sections 1 and 2 of the Sherman Act. Cf. United States v.

United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; and United States v. New Wrinkle, Inc., supra.

66. The evidence shows that the impact of this conspiracy on the defendants has been substantial, has caused a direct loss of customers, a shutdown in business, and it is inescapable as a conclusion from all of the evidence that it has caused a material reduction in the potential sales of the defendant, Original. However the evidence before the court upon which to estimate the loss of potential sales is such as to preclude the court from relying upon it, and only for that reason is the court not able to fix the damages suffered by the defendants for loss of potential sales in each of the years in question.

67. The evidence is that the defendant, Original, sustained damage as a direct result of the actions of the plaintiff in concert with others. The impact of that conspiracy resulted in damages to the business and property of the defendant, Original.

68. The evidence shows direct loss was suffered by the defendant, Original, in salaries, wages and other expenses of shutdown from August 22 to September 23, 1949, in the total amount of $2,561.-45. Defendant, Original, also claims an average cost of $116.43 per day for eleven days' stoppage of production from November 18 to December 1, 1949, following the termination of a working agreement with Cabette. This would amount to $1,280.73. The defendant, Original, also claims the sum of $3,830 for the loss it sustained as a result of the unsuccessful working arrangement it had with Cabette from the latter part of September to on or about November 23, 1949.

In regard to the working arrangement, the court finds the facts to be:

(1) that the arrangement was voluntarily brought about by the mutual desire of the officers of Cabette and Original;

(2) it was a business expedient for both parties;

(3) its termination came about through disagreement of the parties to the arrangement;

(4) there is not a preponderance of the evidence to indicate that the plaintiff Clapper and his licensees, through any conspiratorial act, caused the termination of the working arrangement.

Accordingly, defendant, Original, is not entitled to loss claimed for the eleven days' work stoppage and the claimed loss of $3,830 arising out of the unsuccessful working arrangement.

69. The evidence shows that the defendant, Original, had negotiated for financing for continued operation which had to be dropped entirely by the shutdown following the notices sent by the plaintiff in concert with others, in August, 1949, the cost of which to the defendant, Original, was $317.20, which it is entitled to recover.

70. The evidence shows that the defendant, Original, had expended for advertising the sum of $4,563.70, which was rendered valueless by the forced shutdown in August, 1949, as a result of said notices of infringement sent to the defendant and to its distributors.

71. The evidence shows that the defendant, Original, has incurred in fees and expenses obligations for $28,244.31 in defense of the patent infringement action instituted by the plaintiff and Flora as a part of the conspiracy in violation of the antitrust laws. The court finds these legal fees and expenses to be reasonable for the services rendered by counsel for the defendant, Original, in the defense of the patent infringement litigation, and should be awarded to defendant's counsel for such services. Said sum, however, is not to be included as an element of damages in the antitrust action to be increased threefold, as defend-

ants would have the court do. It is to be awarded counsel for the defendants by reason of their representing the successful parties in the patent infringement action, and by reason of the exceptional circumstances involved in the case concerning the validity of the patent and its use by the patentee and his licensees, all as found in these findings of fact.

72. The evidence shows that there has been a direct loss of sales by defendant, Original, to Farm Equipment Sales Co. and Stover-Winsted Co. as a consequence of the notices of infringement sent pursuant to the conspiracy created by the License Agreement of August 3–4, 1948. Defendant, Original, has vigorously contended and attempted to show that it also sustained loss of sales to Firestone Tire & Rubber Co. as a consequence of notices of infringement sent pursuant to the aforesaid conspiracy. In respect to the latter company, the court fails to find from the record sufficient evidence to support the defendants' claim of loss of sales to Firestone Tire & Rubber Co. by reason of the notices of infringement sent pursuant to the conspiracy.

Following the time Stover-Winsted Co. and Farm Equipment Sales Co. stopped doing business with the defendant, Original, the evidence shows that during the years 1949 through the first eleven months of 1956, Farm Equipment Sales Co. purchased from Comfort Equipment Company 9,084 covers. Such purchases were as follows:

Farm Equipment Sales Co.

| Year | Comfort Covers Purchased |
|---|---|
| 1949 | 1,339 |
| 1950 | 1,452 |
| 1951 | 1,985 |
| 1952 | 1,494 |
| 1953 | 982 |
| 1954 | 732 |
| 1955 | 649 |
| 1956 (11 months) | 451 |
| | 9,084 |

Following the time Stover-Winsted Co. stopped doing business with the defendant, Original, it made the following purchases of Comfort covers from Comfort Equipment Company:

Stover-Winsted Co.

| Year | Comfort Covers Purchased |
|---|---|
| 1949 | 1,410 |
| 1950 | 1,425 |
| 1951 | 2,361 |
| 1952 (Jan. thru May) | 660 |
| | 5,856 |

The evidence shows that during said years the actual average net profit to defendant, Original, on the sale of half/Cabs amounted to $1.35 per unit. Accordingly, the loss sustained by defendant, Original, in respect to the loss of sales to Farm Equipment Sales Co. amounted to $12,263.40, and the loss of sales to Stover-Winsted Company amounted to $7,905.60. Where there is certainty as to the fact of damage which is thus established, there may be uncertainty as to the amount of damages. It is reasonable to conclude that the defendant, Original, could have sold at least an equal number of tractor covers to Farm Equipment Sales Co. and Stover-Winsted Co. had said companies not ceased to do business with the defendant, Original, as a result of the notices of infringement sent to them pursuant to the conspiracy created by the License Agreement of August 3–4, 1948. Therefore the court finds that the defendant, Original, has been damaged by reason of the loss of sales to said companies in the total amount of $20,169.00.

73. The evidence shows that an estimate was made by the defendant, Williams, president of the defendant, Original Tractor Cab Co., Inc., as to the total number of tractor covers that could have been manufactured and sold by the said defendant, Original, but for the interference with the business of the defendant, Original, by the plaintiff, together with Flora and their licensees acting in concert. A very considerable amount of time and record was devoted to the explanation of the defendants' theory upon which the asserted right to recover for loss of potential sales is predicated. Briefly and generally, the theory of the defendant, Original, as explained by its president, Williams, and its accountant, Morgan, involved the process of taking the number of dealers the defendant, Original, had prior to the summer of 1949, at which time it changed its sales methods from dealers over to distributors. Williams explained he was very careful in making his calculations in order to stay on the conservative side. In his survey of existing dealers, he found there were 901 dealers listed. But of the 901 listed dealers he could find only 684 cards showing actual sales to such dealers. Therefore in his calculations he used the figure of 684 dealer cards as the basis from which to test the average potential sales to the established dealers. Among the 684 dealers, he found that 336 had sent orders in and had purchased half/Cabs. The 336 dealers purchased 1,275 half/Cabs. By taking the number of purchases of half/Cabs and relating them to the number of dealers who had actually purchased half/Cabs, he found that the company sales amounted to three and eighty hundredths half/Cabs per dealer. By relating the company sales of half/Cabs to all of its dealers, he found that the company's average sales of half/Cabs per dealer amounted to 1.86 half/Cabs.

After the establishment of the distributorships, Williams made a survey in order to determine the total number of dealers served by the distributors. It was found that the distributors serviced 17,450 dealers. Commencing with the year 1949, the first year defendant, Original, had distributors, and the first year of the impact of the conspiracy, the defendant, Original, estimated the sale of one unit to each dealer served by its distributors. Thus, it estimated its potential sales for the year 1949 at 17,450 units. Taking the year 1950 as the base year and applying the annual percentage growth in tractor population in the United States and applying such percentages of tractor population growth to the subsequent years to and including the year 1956, and by applying the estimated unit sales per dealer of 1.86, defendant thereby arrived at the respective total unit potential sales for the years 1950 through 1956. Page 8A of Defendants' Exhibit JJJ sets forth the computation

of the number of units of potential Original half/Cab sales as estimated by Williams and the accountant Morgan. They are as follows:

### Computation of Number of Units of Potential Original Half/Cab Sales

| Year | Tractor Population | Per Cent of Base Year (1950) | Estimated Unit Sales per Dealer | Total Unit Potential Sales |
|------|------|------|------|------|
| 1949 | 3,230,000 | —— | 1 | 17,450 |
| 1950 | 3,442,000 | 100.00 | 1.86 | 32,457 |
| 1951 | 3,778,000 | 109.76 | | 35,625* |
| 1952 | 3,859,000 | 112.12 | | 36,391* |
| 1953 | 3,950,000 | 114.75 | | 37,244* |
| 1954 | 4,122,000 | 119.75 | | 38,867* |
| 1955 | 4,198,000 | 121.96 | | 39,585* |
| 1956 | 4,320,000 | 125.50 | | 40,734* |
| | | | | 278,353 |

By eliminating what defendants' accountant determined to be abnormal operating expenses by reason of the impact of the conspiracy and the attendant litigation, the accountant arrived at an adjusted net unit profit per half/Cab. By further applying the estimated unit potential sales as estimated by Williams according to his estimated sales per dealer as related to tractor population growth, defendant established a different and higher net unit profit through the commensurate savings in overhead costs per unit due to the greater estimated production. By applying the greater net unit profit to the respective annual estimated potential sales, the accountant arrived at the total dollar profits which defendants claim could have been realized on potential sales except for the impact of the conspiracy for the period 1949–1956, which amounted to $1,364,200.10. From this was deducted the actual profit realized from sales of half/Cabs as reflected by the accountant's pro-forma earnings statement adjusted to eliminate the abnormal effects of the conspiracy and litigation. The realized profits from actual sales of half/Cabs during the period amounted to $79,996.17. Subtracting the realized profits from the total estimated profits, the accountant arrived at the figure of $1,284,203.93, which the defendants claim represents the total profits that could have been realized on the estimated potential sales except for the antitrust violations by plaintiff Clapper, together with Flora and their licensees.

The court has spent numerous hours analyzing and weighing the defendants' evidence in regard to the damages sustained, and although it is convinced, even beyond a reasonable doubt, that the defendant, Original Tractor Cab Co., Inc., has been damaged as a result of the impact of the conspiracy of the plaintiff Clapper, and Flora and their licensees, the court is firmly of the opinion that the Williams-Morgan theory of computing the estimated potential sales is unrealistic and is based upon assumptions and conclusions which would lead the court into too much speculation and conjecture if reliance were to be placed

* Increased by percentage of tractor population over base year, 1950.

upon it. For example, in order to rely upon the theory, it must be assumed that each of the distributors and the dealers included in Williams' estimate would continuously and consistently handle and sell the Original product, and that they would do so throughout the years involved. As a matter of fact, the record discloses that Firestone Tire & Rubber Co., whose stores were included among the 17,450 dealers, completely discontinued the sale of tractor cabs either in the year 1952 or 1953. Likewise, in order to rely upon the Williams-Morgan theory, it must be assumed that all of the dealers operate in states having climatic conditions wherein tractor covers would have sales potential. Further, it must be assumed that the sales of the defendant, Original, would consistently increase annually and that there would be no peaks and valleys in its annual sales. The evidence in the case indicates that this was not true in the case of any of the defendant, Original's, competitors who were engaged in the tractor cover business in each of the years here involved. In short, the formula upon which the defendant, Original, would have the court find its loss of profits is so fraught with pitfalls as to render it completely unreliable as an aid to the court in estimating reasonably the damages defendant, Original, has sustained. The court must have before it such facts and circumstances, or comparisons, for example, as to enable it to make an estimate of damage based upon judgment and not upon conjecture or guesswork. The evidence as a whole is not sufficient from which to draw a reasonable inference to support the conclusion, that except for the interference with the business of the defendant, Original, by the plaintiff and Flora and their licensees, the defendant, Original, could have sold the number of tractor covers indicated by the estimate of potential sales with the resultant profit claimed thereon.

74. The losses heretofore stated resulted in damage to the business and property of the defendant, Original, as a consequence of the illegal conspiracy of the plaintiff Clapper, and Flora and their licensees acting in concert. For such damage, defendant, Original, is entitled to recover the following amounts of compensatory damages:

(1) Costs resulting from forced stoppage of production, from August 22, 1949 through September 23, 1949 ................................... $ 2,561.45
(2) Expenses incurred in finance negotiations ...... 317.20
(3) Advertising costs rendered useless by reason of forced work stoppage ....................... 4,563.70
(4) Loss of potential sales to Farm Equipment Sales Co. for the years 1949 through the first eleven months of 1956 ........................... 12,263.40
(5) Loss of potential sales to Stover-Winsted Co. for the years 1949 through the first five months of 1952 ...................................... 7,905.60

Total .............. $27,611.35

75. The licensees under the Agreement of August 3–4, 1948, were added to this action as cross-defendants. Thereafter, the counterclaim was dismissed as to said licensees and Flora and the defendants entered into covenants not to sue upon payment by those parties to the defendants the amount of $110,000. Those covenants not to sue are plainly intended by their terms not as releases but only covenants not to sue, and it is expressly set out that the amount paid was not satisfaction which would discharge the liability of the remaining tort-feasor, Clapper. However the amount paid should be considered as a pro-tanto credit, which in this instance, exceeds the liability of the plaintiff, Clapper to the defendant, Original, even after trebling the amount of compensatory damages sustained by the defendant, Original, as a result of the plaintiff and his co-conspirators' antitrust violations. That is to say, by trebling the compensatory damage sustained by the defendant, Original, the figure of $82,834.05 is obtained. By crediting against this sum the amount of $110,000, the amount paid the defendants under the covenants not to sue, the liability on plaintiff Clapper for compensatory damage to defendants is completely liquidated. But even though there is no further liability on the plaintiff Clapper for compensatory or general damages, there still remains his liability for the payment of defendants' attorney's fees for services rendered in defending the patent infringement action, which the court finds to fall within the category of "exceptional cases" as evidenced by the whole of the findings herein. As heretofore found, a reasonable attorney fee and reimbursement of counsel for miscellaneous expenses in rendering legal service in the patent infringement phases of this case is the sum of $28,244.31. As a part of the judgment in this proceeding, the plaintiff Clapper will be ordered to pay such sum to defendants' counsel of record. In addition to the payment of attorney's fees in connection with the patent infringement action, the defendants are entitled to have and recover from the plaintiff Clapper, reasonable attorneys' fees for the services of their attorneys in the prosecution of defendants' counterclaim and crosscomplaint for antitrust violations on the part of plaintiff Clapper and Flora and their co-conspirators. Such attorneys' fees will be fixed by the court upon petition of council for the defendants and after hearing thereon.

In addition to the foregoing attorneys' fees, defendants are entitled to recover fully the costs of suit laid out and expended by them in their defense to each cause of action brought against them in the five paragraphs of complaint, and in the prosecution of their counterclaim and crosscomplaint for the antitrust violations.

76. The general release dated November 23, 1949, between the Cabette Company and Original Tractor Cab Co., Inc. was executed and signed by Cabette but was not executed by Original or Williams.

77. The unexecuted general release was prepared as and for settlement of the controversy between the parties thereto. It did not contemplate or involve any settlement for violation of the antitrust laws and would not settle such matter. Consequently it does not release the plaintiff from liability for damages to the defendant, Original.

78. Some evidence is in the record tending to indicate that tractor covers sold during the working arrangement between Original and Cabette in 1949 were identified as "half/Cabs" rather than "Original Cabettes", as contemplated by the parties. If this was a violation of the arrangement between Original and Cabette, it is nothing of which the plaintiff may complain and does not constitute, without more, any evidence of unclean hands with respect to the subject matter of the counterclaim for damages for violation of the antitrust laws. The evidence does not show that the defendants had knowledge of the illegal conspiracy at and

subsequent to the meeting in Chicago on September 12, 1949. The acts of the defendants under the economic duress imposed by such conspiracy in yielding to the pressure imposed by the conspiracy does not make the one who thus yields a party to the conspiracy. The evidence does not show unclean hands on the part of the defendants with respect to this action for damages.

### Conclusions of Law

From the foregoing facts the court concludes:

1. That this court has jurisdiction over the parties and the subject matter in this cause of action.

2. The first cause of action for declaratory judgment, having been withdrawn by the plaintiff, is dismissed.

3. The charge of unfair competition included in the second cause of action is dismissed.

4. The third cause of action, for false patent marking, having been withdrawn by the plaintiff, is dismissed.

5. There was no valid agreement between the plaintiff and the defendants entered into on September 12, 1949, or subsequently, with respect to discontinuance of manufacture of tractor covers, and judgment on the fourth cause of action for breach of contract, is entered for the defendants.

6. The Clapper patent is invalid.

7. The subject matter of the Clapper patent was fully anticipated in the art, was an obvious adaptation, and an unpatentable aggregation.

8. Whether the Clapper patent has been infringed by the defendants is moot in view of the court's conclusion of law that the Clapper patent is invalid.

9. The plaintiff's second cause of action is dismissed.

10. The Agreement of August 3–4, 1948, is per se violative of Section 1 of the Sherman Act.

11. The Agreement of August 3–4, 1948, also violates Section 2 of the Sherman Act, in that it manifests an attempt to monopolize, by the combining of non-competing patents in a single agreement by competitors, and gives to the parties to the agreement veto power over patent rights that are not referable to their individual businesses, or licenses granted, even though the licensees may have continued to compete with each other, after the execution thereof. They are jointly given an exclusive market and control thereover by the terms of the agreement, and not singularly as a consequence of patent privileges acquired.

12. A conspiracy or combination having as its object or effect a restraint of interstate trade and commerce, whether accomplished by legal or illegal means, falls within the ambit of Sections 1 and 2 of the Sherman Act, and is condemned thereby. Patent rights give no protection from the prohibitions of the Sherman Act, when they are associated, controlled, or used in consequence of an agreement, that is in restraint of interstate trade or commerce.

13. When the two individual patentees, Clapper and Flora, combined their patents, they monopolized and contracted between themselves and with their licensees, to secure mutual benefits for themselves and their licensees, that are not given to them by the patent laws, and which agreement gave to the opposite patentee and licensees, a right of control over patent rights that may be associated and used in restraint of interstate trade and commerce; the purpose and result of such an arrangement and conduct was a violation of Sections 1 and 2 of the Sherman Act.

14. The patentees and their licensees had no legal right to act in concert and join hands in an agreement shown to be in violation of the Sherman Act, thereby refusing a license to another manufacturer in the field, even though the latter was carrying on some business in violation of those patents.

15. Defendants are entitled to recover damages from the plaintiff as a result of losses suffered as a result of

actions of the plaintiff, together with Flora and their licensees, and resulting to the business of the defendant, Original, in the following amounts:

(1) Costs resulting from forced stoppage of production, from August 22, 1949 through September 23, 1949 .................................... $ 2,561.45
(2) Expenses incurred in finance negotiations ....... 317.20
(3) Advertising costs rendered useless by reason of forced work stoppage ....................... 4,563.70
(4) Loss of potential sales to Farm Equipment Sales Co. for the years 1949 through the first eleven months of 1956 ........................... 12,263.40
(5) Loss of potential sales to Stover-Winsted Co. for the years 1949 through the first five months of 1952 ................................... 7,905.60

Total $27,611.35

———◆———

16. The damages assessed against the plaintiff shall be increased threefold in accordance with the Clayton Act; however as against that threefold amount, the plaintiff Clapper is entitled to credit the sum of $110,000 heretofore paid by Flora and the cross-defendants.

17. The covenants not to sue entered into between the defendants and Flora and the cross-defendants, were not releases, and do not discharge the liability of the plaintiff for violation of the antitrust laws.

18. The defendants are not estopped from asserting their counterclaim for damages under the Clayton Act by the arrangement made with the Cabette Company in October, 1949.

19. The third cause of action for breach of contract is dismissed.

20. Judgment shall be entered for the defendants on the counterclaim, and in the judgment it shall be ordered that the defendants have and recover of the plaintiff Clapper, attorney fees and reimbursement of miscellaneous legal expense in the amount of $28,244.31 for the services of defendants' counsel in their defense to the patent infringement action in this case. It shall also be or-dered that defendants are entitled to reasonable attorney fees, to be fixed by the court upon petition and hearing, covering the services of defendants' counsel in the prosecution of the counterclaim and cross-complaint for antitrust violations on the part of plaintiff Clapper, together with Flora and their co-conspirators. In addition to the payment of the attorney fees aforesaid, the defendants shall fully recover of the plaintiff their total costs of suit laid out and expended in this cause.

Let judgment be entered accordingly.

Correcting Entry for January 14, 1958

After the court entered its findings of fact and conclusions of law herein, it occurred to the court that in finding and concluding that defendants were entitled to have and recover from plaintiff Clapper, reasonable attorney fees for the services of their attorneys for prosecuting the defendants' counterclaim and cross-complaint, that the court erred in including services rendered by defendants' counsel in the prosecution of defendants' cross-complaint against the cross-defendants.

Accordingly, it is now ordered that the findings of fact and conclusions of law

heretofore entered by the court in this cause be amended to exclude from consideration, attorney fees for defendants' counsel covering services rendered in the prosecution of the defendants' cross-complaint against the cross-defendants. That is to say, the attorney fees to be allowed defendants' counsel in connection with the prosecution of the antitrust phases of this action will be limited to services rendered upon the defendants' counterclaim.

## Memorandum
## July 9, 1958

STECKLER, Chief Judge.

This cause is now before the court upon the following matters:

(1) The fixing of attorneys' fees to be awarded defendants' attorneys for prosecuting the counterclaim for antitrust violations.

(2) Motion of defendants for admission of attorneys' itemization.

(3) Motion of plaintiff for an order requiring defendants' counsel, John F. Linder, to file an itemization of his charges for services on the antitrust cause of action.

(4) Motion of defendants to amend findings of fact and conclusions of law.

(5) Plaintiff's post-hearing brief anent attorney fees, and motion to amend findings of fact and conclusions of law, etc.

(6) Plaintiff's objections to defendants' bill of costs.

(7) Motion for production or for leave to take additional depositions.

(8) Motion for admission of plaintiff's Exhibits 199 and 200.

Since the last two above mentioned motions go to the matter of admitting additional evidence into the record, the court deems it advisable to take up and dispose of such motions before turning to the other motions.

On May 2, 1958, plaintiff filed his motion for an order requiring defendants to produce, for inspection, photographing and copying, all written documents, instruments and agreements made or entered into contemporaneously with plaintiff's Exhibits 172 and 173, containing any other terms or conditions of the settlement agreement, etc. (privileged communications between attorney and client to be excepted) ; or in the alternative, for an order permitting plaintiff on five days' notice to take the deposition of any one or more of the parties listed in paragraph IV of the motion for the purpose of establishing the existence of the "hitherto undisclosed terms and conditions of the settlement."

Since the defendants made satisfactory voluntary production of the documents sought (plaintiff's proffered Exhibits 199 and 200), the motion for production or the alternative request for depositions are now moot and of course the court will make no ruling thereon.

On June 9, 1958, plaintiff filed his motion for admission of his proffered Exhibits 199 and 200. The court has carefully considered this motion, including the contents and substance of the exhibits which were attached thereto (plaintiff's proffered Exhibits 199 and 200). After such consideration and a further re-evaluation of the evidence, including the settlement agreement and the covenant not to sue which were entered into with plaintiff's co-conspirators, the court is of the opinion that nothing would be gained on the part of the plaintiff through an admission of plaintiff's proffered exhibits, and that accordingly the motion should be and the same is hereby overruled.

The court will stand on its prior ruling whereby it has found that the plaintiff has not been released as a tort-feasor by the terms of the settlement and covenant not to sue executed by the defendants in connection with their settlement with the other alleged joint tort-feasors. Moreover, plaintiff's proffered Exhibit

200, the waiver and release of attorneys' lien, would not give aid to the plaintiff in his contention that he is absolved from payment of attorneys' fees by reason of his claimed release based upon this construction of the covenant not to sue. The waiver and release of attorneys' lien amounted to no more than what it purported to accomplish, i.e., to cause defendants' counsel not to look to Comfort Equipment Company, Burch Manufacturing Company, Cab-Ette Company and Lee Flora, plaintiff's co-conspirators, for the payment of any fees whatsoever, in any of the then pending litigation in three different district courts, in consideration of the execution of the agreement of settlement. The defendants, Williams and Original, were not parties to the waiver and release of attorneys' lien. Only their attorneys had such a lien to waive and release. Surely plaintiff cannot seriously contend that by such action on the part of defendants' counsel, the defendants are now precluded from recovering as a part of their statutory remedy, a reasonable attorneys' fee and costs as provided by the antitrust laws. Such an argument seems frivolous beyond words when considered in the light of the entire record in this case. Suffice to say that this court believes that the defendants as parties litigant are still entitled to recover a reasonable attorney fee for the use of their attorneys against their remaining defeated adversary in this long and expensive litigation.

The court will next take up the matter of fixing the attorney fees to be awarded defendants' attorneys for their services in prosecuting the counterclaim for damages sustained by defendants as a result of plaintiff's violation of the antitrust laws.

Defendants' counsel have submitted evidence by way of expert testimony and itemized statements tending to show that they have earned attorneys' fees for services in their antitrust cause of action totaling $141,035. This they are claiming in addition to the attorneys' fees in the amount of $28,244.31 heretofore fixed by the court for their services in the defense of the patent infringement action.

The court has awarded compensatory damages to the defendants in the amount of $27,611.35 which, when trebled, amount to $82,834.05. Against this sum has been credited $110,000 received by the defendants from plaintiff's co-conspirators for a covenant not to sue. Thus the court now finds what remains to be done is the fixing of defendants' attorneys' fees in the antitrust phase of the lawsuit.

The court has carefully considered the evidence and post-trial briefs relating to attorneys' fees in the antitrust cause of action. The court is not unmindful of the complexities of the case, nor of its far-flung reaches. The case has been in process for over eight years and has consumed hundreds of hours of the court's time. Nor is the court overlooking the fact that it is convinced that this action was brought as a furtherance of the conspiracy, which the court believes had its inception prior to the granting of the patent in issue. Notwithstanding all of this, the court is bound by the authorities relative to the matter of fixing attorney fees in this type of action, particularly the rule as followed in the Seventh Circuit. See Milwaukee Towne Corp. v. Lowe's, Inc., 7 Cir., 1951, 190 F.2d 561. See also Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846.

With the Milwaukee Towne Corp. case as a guide, the court concludes, and therefore finds, that the request for attorneys' fees in the amount of $141,035 for services of defendants' attorneys in the antitrust cause of action, does not bear a realistic relation to the amount of compensatory damages awarded. With regard to this finding, the court is not in accord with the views of the defendants whereby they would have the

court include as a part of the basis of compensatory damages, the amount of $28,244.31, the attorney fees fixed for their services in defending the patent infringement action. No convincing authority has been shown to support their position in that regard. Nor does the court agree with the defendants in respect to their position that the court ought to readjust the credit allowed on the damages awarded. Defendants would have the court deduct their expenses and claimed attorneys' fees in connection with the venue issue from the $110,000 paid defendants pursuant to the covenant not to sue, using the balance as a credit against the trebled compensatory damage. Likewise, as in their claim that the attorneys' fees for defending the patent action should be included as a part of the compensatory damage in computing the treble damages, they have shown no authority to support their position and the court has been unable to find any.

Approaching the issue of attorneys' fees from the other side, plaintiff would have the court disallow all fees for defendants' attorneys prior to the entry of December 14, 1954, the order of dismissal, whereby the complaint was dismissed by Flora as against the defendants, Williams and Original, and the counterclaim and cross-complaint dismissed by Williams and Original against Flora, Comfort, Burch and Cab-Ette. This is on the theory that attorneys' fees are to be included as part of the costs and that item four of the order of dismissal provides, "That no costs be awarded to any party litigant designated in this order, the respective parties litigant bearing their own costs." This theory, as so many others proffered by plaintiff, at first blush might seem to have some merit, and the court is not wholly ignoring it. But the plaintiff does not stop there, he goes on and asks to be completely exonerated from payment of all costs and attorneys' fees incurred during the three-year period devoted to the venue issue involving his co-conspirators and the appeal taken from the order of this court in respect thereto. He would have the court believe his hands are stainless of the part he played in the conspiracy. During that time he was as much of a litigant in the antitrust cause of action as at any other time throughout the long course of this controversy. It was he who reaped the greatest benefits from the conspiracy. The presence of the co-conspirators before the court, more than anything else, made it possible for the court to ascertain the true relationship between them and the plaintiff and thus the existence of the conspiracy. Not only that, it should be borne in mind that the District Court for the Western District of Missouri, on October 27, 1953, had enjoined and restrained the plaintiff from instituting any proceeding, judicial or administrative, for infringement of plaintiff's patent alleged to have occurred prior to such date. It can be concluded from that injunctive decree that the Missouri District Court intended to deprive the plaintiff of the fruits of his patent during the period of the existence of the conspiracy, which this court has also found to have existed prior to the Missouri District Court action. And this court has found that by the bringing of this action in the Southern District of Indiana, the conspiracy was furthered, that this action was a part of the conspirators' scheme to effectively carry forth their conspiracy and help bring it into complete fruition. Why the Missouri District Court made no mention in its decree of the "maintenance" of any pending infringement action at the time of its decree is unexplained. But to say the least, it is not logical to believe that that court intended to exempt this action in this district merely because it had been brought prior to the date of its injunctive decree. Since there is no conclusive evidence on this point before this court, it is assumed that the Missouri District Court, out of judicial conservatism and comity, left the matter of the pendency of this action to the discretion

of this court in view of the pending counterclaim and cross-complaint. The decree there was a consent decree without the benefit of findings of fact and conclusions of law. Certainly the spirit of that court's decree would dictate that this action for patent infringement especially in view of the record in this proceeding, should have abated at the time of that decree. Instead of withdrawing the complaint for patent infringement, the plaintiff and his co-conspirator, Flora, chose to pursue the action beyond the date of that decree, even though they knew it was a remnant of their earlier conspiratorial actions.

Of course the plaintiff does not agree with such a construction of that decree, and the court here being somewhat in doubt as to its full meaning, concluded that this entire litigation should be heard on the merits. Except for such doubt, this court should have dismissed the complaint here in suit.

With the foregoing in mind, the court concludes that its order of December 14, 1954, did not relieve plaintiff from payment of a just portion of the attorneys' fees and costs during the pendency of the venue litigation. Out of fairness, however, the court should not fail to consider as a weight factor in determining a reasonable attorney fee for defendants' attorneys in the antitrust litigation, the recovery made and the attorneys' fees received in connection with the $110,000 paid by plaintiff's co-conspirators. Though the arrangement between defendants and their counsel was a private one, not subject to the control of the court at the time of payment, nonetheless, it cannot be altogether ignored in the separate matter of assessing attorneys' fees at this time.

Therefore, considering the evidence in the light of the court's first-hand knowledge of much of the services performed by defendants' attorneys, and the value thereof, the court finds that a reasonable fee for their combined services should be, and is hereby fixed in the amount of $25,000. As to the division of such amount, counsel will be left to their own discretion.

The court is well aware that this sum represents just a little less than the compensatory damage found to have been sustained by defendants, but except for the difficulty of proof, it is ventured that the actual damage suffered as a direct result of the violation of the antitrust laws by the plaintiff and his co-conspirators would have been found to be far greater.

### Motion of Defendants for Admission of Attorneys' Itemization, and Motion of Plaintiff for an Order Requiring Defendants' Counsel, John F. Linder, to File an Itemization of His Charges, for Services on the Antitrust Cause of Action

Since the court has now disposed of the matter of fixing the amount of attorneys' fees for the defendants' attorneys in prosecuting the antitrust cause of action, the motion of defendants for admission of attorneys' itemization, and motion of plaintiff for an order requiring defendants' counsel, John F. Linder, to file an itemization of his charges, are considered to be moot.

### Motions to Amend Court's Findings of Fact and Conclusions of Law

Next the court turns to the respective motions filed by each side for amendment of the court's findings of fact and conclusions of law. Their motions and supporting briefs have been carefully read and considered. After such consideration and further review of the pertinent parts of the record, the court concludes that it will stand on the findings of fact and conclusions of law heretofore made.

### Plaintiff's Objections to Defendants' Bill of Costs

The court now turns to the plaintiff's objections to the bill of costs submitted by the defendants. Their bill of costs was filed on January 27, 1958. On February 11, 1958, the plaintiff filed objections thereto. Due to the complex issues involved, many of which were previously argued, the clerk of the court

made no attempt to tax the costs. Therefore, this matter is not being considered on review of the actions of the clerk, but by the court in the first instance.

The bill of costs totals $39,257.26, and with certain minor exceptions, the plaintiff objects to the whole thereof. Following is a categorical breakdown of the items listed in the original bill of costs:

| | | |
|---|---|---:|
| Item 1 | Fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case | $ 1,453.76 |
| Item 2 | Fees for witnesses (28 U.S.C. § 1821) | 75.28 |
| Item 3 | Fees for exemplification and copies of papers necessarily obtained for use in case | 207.98 |
| Item 4 | Docket fees under 28 U.S.C. § 1923 | 72.50 |
| Item 5 | Costs incident to taking of depositions | 1,077.09 |
| Item 6 | Schedule I—Services, travel and telephone expense of defendant Williams | 27,189.53 |
| Item 7 | Schedule II—Travel and telephone expenses of defendants' attorneys | 3,979.17 |
| Item 8 | Schedule III—Expense for services of defendants' accountant | 4,950.00 |
| Item 9 | Schedule IV—Miscellaneous costs of certified copies of Patent Office records and notary fee | 251.95 |
| | | $39,257.26 |

Since filing the original bill of costs, defendants were ordered to itemize with greater particularity Items 1, 3 and 5 of the bill. In their response to that order, which, incidentally was not a satisfactory response and therefore required an additional itemization, defendants called the court's attention to "slight differences" in the amounts of court reporter charges and deposition charges, and asked that the amounts as set forth for such items in the original bill of costs be changed to show the sum of $1,733.64 for court reporter charges, and the sum of $1,050.04 for costs incident to taking of depositions. After such correction, the total amount of the bill of costs would amount to $39,510.09, an increase of $252.83. However, it is apparent that these figures must further be amended in view of defendants' "Further Itemization of Costs" which was filed on May 20, 1958. According to the last itemization, the charges for court reporter amount to $1,688.73, and the costs incident to the taking of depositions amount to $1,049.64. The court will therefore treat the bill of costs to be amended as requested and according to the latest itemization amounting to $39,464.78.

Before taking up the objections to the various items in the bill of costs, it would be helpful to the parties if the court would set aright what appears to be a misgiving on the part of the defendants with respect to the meaning of certain language used in the court's findings of fact and conclusions of law dated January 13, 1958. In its findings and conclusions, the court stated, "In addition to the payment of attorneys' fees aforesaid, the defendants shall fully recover of the Plaintiff their total costs of suit laid out and expended in this cause." This was not the best choice of words in view of what the court had in mind at the time. The court intended merely to have the statutory costs, including the reasonable costs incident to the taking of depositions, assessed against the plaintiff. It was not the intent of the court to go beyond what is normally and customarily included in the assessment of costs in this type of action. Therefore a great bulk of the de-

fendants' bill of costs will be disallowed in fixing the costs to be taxed against the plaintiff.

Perhaps it would also be well at this point to dispose of certain objections which the plaintiff interposes and which flow to the question of whether the defendants should be permitted to recover any costs after the date of the settlement with the plaintiff's co-conspirators, and to the question of whether plaintiff should be taxed with any of the costs incurred in connection with the trial and disposition of the issue of venue. These objections affect all of the items of costs and must be considered in addition to the specific objections to the respective items.

Plaintiff says that by reason of the terms of the agreement made in connection with the execution of the covenant not to sue and the order of the court of December 14, 1954, approving the simultaneous dismissal of the complaint on behalf of Flora as against the defendants Williams and Original, and the counterclaim and cross-complaint on behalf of said defendants as against Flora, Comfort, Burch and Cab-Ette, he, the plaintiff, is exonerated from the payment of costs. Then, moreover, the plaintiff says he took no active part in the trial and disposition of the issue of venue. He says that during the period "from the spring of 1951 through the fall of 1954 the venue dispute occupied the stage, with the Clapper issue completely sidetracked." He claims that he did not participate in the long venue battle in any way, that during the long period of delay the battle was confined to the defendants on the one hand and the cross-defendants on the other.

The settlement agreement which was made at the time the covenant not to sue was given by the defendants to all of the co-conspirators, except the plaintiff Clapper, provided that the dismissals "shall be entered without an award or payment of costs * * * all parties paying their own costs."

The court's order of dismissal of December 14, 1954 specified, "4. That no costs be awarded to any party litigant designated in this order, the respective parties litigant bearing their own costs." In view of the terms of the agreement and the court's order of dismissal, plaintiff concludes that the defendants are thereby bound to bear their own costs up to the date of the order, December 14, 1954. Now in addition to the foregoing, plaintiff further contends that he is in fact released from all liability because the agreements and the covenant not to sue constitute a legal release of plaintiff's joint tort-feasors, and by operation of law, he too is released.

A similar position was taken by the plaintiff in his opposition to the matter of awarding attorneys' fees to defendants for the services of their attorneys in the antitrust phase of this case. What the court has said in that regard will not be fully repeated here. The court disagrees with the theory of the plaintiff, first, because throughout the pendency of this action the plaintiff has been a most active litigant in the antitrust phase of the suit. Actually that phase of the suit has overshadowed the patent infringement action, both from the activities of the plaintiff and the defendants. Had it not been for the fact that the plaintiff's co-conspirators were brought into this court, the scope and effect of the conspiracy might never have been known. Plaintiff's argument that he took no active part in the case during the venue battle does not bear weight.

Plaintiff seems to take the position that since he did not participate in the venue dispute as much as the other litigants, he should only be taxed, if at all, in proportion to the extent of his participation. Bearing in mind the court has found him guilty of violation of the antitrust laws, there is no logical reason why he, as one of the joint-wrongdoers, should not be held account-

able for the full amount of the court costs. It is only in rare cases where one of several joint-wrongdoers is absolved from full liability for court costs. In the case of Vrooman v. Penhollow, 6 Cir., 1911, 186 F. 495, 496, a patent infringement action, one of three defendants made a motion that the costs adjudged against them be distributed among them in proportion to the extent of their participation in the infringement complained of. In the trial below, the evidence was scant as to the extent of the participation of this particular defendant in the infringement. This minor issue received little attention during the trial because of the larger contest over patent infringement. In denying the motion of the complaining defendant, the court said:

"It is apparently true that in some rare cases where there were several wrongdoers, some of whom had participated in doing the wrong only in a trivial or almost wholly unrelated manner, the court has exercised its discretion in their favor and cast the heavier burden of the costs to which all are liable upon the more guilty parties. But such cases are exceptions to the general rule upon very special circumstances. We think the position which Baker has taken and held in this matter has not been such as ought to induce the court to exercise its discretion in his favor. We have the conviction that he was the most potent factor in the infringement and that it was mainly because of his countenance and encouragement that the other defendants persevered in it."

And so it was in the case at bar. The plaintiff Clapper was the dominant figure in the conspiracy. He stood to gain the most and did gain the most from the fruits of the joint-wrongdoings. How, then, can this court exercise its discretion in his favor and shift the costs incident to the venue question over and upon the successful defendants? Certainly not merely because the plaintiff says he did not participate very much in that part of the litigation.

The terms of the agreement and the order of dismissal of December 14, 1954, do not preclude at this stage of the litigation the taxing of the defendants' costs against the plaintiff. Plaintiff was not a party to the agreement nor the covenant not to sue, and he was not included in the order of dismissal. Nor did the court by entering the order of dismissal intend it to have the legal effect plaintiff now claims. The court knows of no rule or theory of law that would preclude the defendants from agreeing with a part of the other litigants that they would bear their own costs up to the time the covenant not to sue was executed and the dismissal entered, and look forward to an ultimate recovery of such costs from their remaining defeated opponent, should they be successful. Whether the court in assessing costs under such circumstances should take into account the prior consideration paid for the covenant not to sue, seems to be a matter to be left to the sound discretion of the trial court.

Throughout plaintiff's argument he fails to draw a distinction between such costs as should be awarded the successful defendants in connection with the patent infringement issue, and the costs which should be awarded in regard to the antitrust phase of the case. Keeping in mind all of the issues in this action, it is doubtful whether such a distinction can be accurately drawn. The court, therefore, must weigh and evaluate the respective items of cost and the objections made thereto, whether such items were incurred prior or subsequent to the dismissal as against the other parties, or whether in connection with the patent or antitrust issues.

The court has previously ruled that the agreement and covenant not to sue

did not constitute a legal release but was only a covenant not to sue.

For these reasons the court now holds that the plaintiff has not been relieved of paying the defendants' legitimate costs of suit.

The court will now deal with the items of costs as they are listed in the bill of costs and consider them in the light of plaintiff's objections.

## Item 1

Fees of court reporter for all or
 any part of the transcript
 necessarily obtained for use
 in the case— $1,688.73

Plaintiff objects generally to the allowance of this item but particularly objects to the assessment of any costs against the plaintiff for an extra copy of the transcript of the testimony taken during the trial. Plaintiff argues that such extra copy of the transcript was merely for the convenience of counsel and therefore not necessarily obtained for use in the case. By inference plaintiff also objects to the cost of the original stenographic transcript furnished the court. This is on the premise that the court did not order a transcript of the evidence. Plaintiff, for authority in support of the first proposition, cites Hope Basket Co. v. Product Advancement Corp., D.C.Mich.1952, 104 F.Supp. 444; Department of Highways v. McWilliams Dredging Co., D.C.La.1950, 10 F.R.D. 107; Kenyon v. Automatic Instrument Co., D.C.Mich.1950, 10 F.R.D. 248; Stallo v. Wagner, 2 Cir., 1917, 245 F. 636. For his second proposition, plaintiff cites and relies upon Firtag v. Gendleman, D.C.D.C.1957, 152 F.Supp. 226; Marshall v. Southern Pacific Co., D.C.Cal.1953, 14 F.R.D. 228, and Cooke v. Universal Pictures Co., D.C.N.Y.1955, 135 F.Supp. 480. From a reading of these and other cases, one thing is made

abundantly clear; the fixing and allowing of court costs vary in different districts and according to the judicial discretion of the various judges in view of the varying circumstances in the respective cases. Of course there are generally fixed standards which should be followed, but in each case the matter of allowing costs must be determined according to the peculiar facts and circumstances.

In this court it has been a custom of long standing, amounting to an unwritten rule, that in any case when a party orders a transcript of the evidence, the original transcript must be furnished the trial judge and the expense thereof must be borne by the party ordering the same, or, as the court otherwise directs. In the case at bar, since the court early in the proceedings made it known to counsel that in view of the complexities of the case they would be required to prepare and submit proposed findings of fact and conclusions of law, it is nothing more than reasonable that counsel and the parties should have anticipated the need of a transcript of the evidence and the cost incident thereto. Therefore the court concludes that defendants are entitled to recover as costs in this proceeding their expenditures toward the cost of the original stenographic transcript of the evidence and minutes of the trial. Also, the cost of one copy for the use of their counsel in the conduct of the trial and in the post trial procedures which were required by the court. The court will not, however, order the plaintiff to pay the costs of reporters' fees and charges for transcripts of oral arguments which were had at various times through the pendency of this action. Such transcripts, it is felt, were principally for the convenience of counsel and should be borne by the party requesting them.

With these pronouncements as a guide, the following costs under Item 1 of the

bill of costs will be taxed against the plaintiff, but in respect to all other costs thereunder the plaintiff's objections are sustained:

| | | | |
|---|---|---|---|
| May 18, 1953 | Walene E. Shields<br>Transcript from trial of venue.<br>One-half of cost of original<br>(391 pages) ................$ 107.53<br>One-half cost of two copies<br>@ 25¢ per page ($195.50) ....... 97.75<br>Postage ..................... 1.44 | | |
| | | | $ 206.72 |
| June 11, 1957 | E. Clifford Powell<br>Daily copy (carbon) of trial<br>June 3, 4, 5, 6/57<br>869 pages @ 40¢ .............. 347.60<br>17 pages index @ 80¢ .......... 13.60 | | |
| | | | 361.20 |
| August 10, 1957 | E. Clifford Powell<br>Transcript of trial, 6/20–28/57<br>1,481 pages @ $1.05 ........... 1,555.05<br>26 pages index @ $2.10 ........ 54.60<br>1½ days reporter @ $25 ...... 37.50 | | |
| | One-half due by Original | | 823.57 |
| Total Allowed – | Item 1 .............................. | | $1,391.49 |

## Item 2

### Fees for Witnesses (28 U.S.C. § 1821)—$75.28

█ Plaintiff objects to the allowance of this item of costs except with respect of Ralph L. Morgan—$19.20, Ray Steffey—$8.62, and Harold B. Hood—$4.00. As to the witness fee and mileage for the defendant Williams, plaintiff points out that he being a party to the action and a real party in interest, attended throughout the whole of every day of both sessions of the trial, and actively participated in the management thereof; that therefore he did not, in other words, attend merely as a witness. Such being the case, the claimed witness fee and mileage for him is not allowable. Plaintiff cites Barnhart v. Jones, D.C.W.Va. 1949, 9 F.R.D. 423; Picking v. Pennsylvania R. Co., D.C.Pa.1951, 11 F.R.D. 71; Ryan v. Arabian American Oil Co., D.C. N.Y.1955, 18 F.R.D. 206; and Tuck v. Olds, D.C.Mich.1886, 29 F. 883.

█ Similarly, as to the witness fee for defendants' counsel, Messrs. Swecker, Linder and Earnest, plaintiff argues that since all of them were attorneys of record in this case and actively participated in the conduct of the trial, they should not be permitted to shift position from counsel table to witness chair and there-

upon be entitled to witness fees. The court agrees with the plaintiff. Accordingly only the following costs will be allowed under Item 2 of the bill of costs:

Ralph L. Morgan ..............$ 19.20
Ray Steffey ................. 8.62
Harold B. Hood .............. 4.00

Total Allowed — Item 2 ................................$ 31.82

---

## Item 3

Fees for exemplification and copies of papers necessarily obtained for use in case—$207.98

To this item the plaintiff objects because there has been no itemization of the amount sought. Plaintiff relies upon Judge Hincks' ruling in Perlman v. Feldmann, D.C.Conn.1953, 116 F.Supp. 102, 112. There, upon timely objection, Judge Hincks disallowed an item of costs covering the making of copies of unidentified documents. This court would be inclined to rule similarly on the item here at hand except for the court's own knowledge of the manner in which the parties dealt with each other in providing copies of the very great number of letters and documents here involved. The court recalls the many conferences and informal agreements among counsel with respect to furnishing each other documents or copies of documents. Admittedly it would be far better for the problem now presented if the defendants had kept an itemized list identifying each letter, invoice, circular, catalog page, work sheet, etc., which they had reproduced, with a further explanation as to how it was used in the case.

Counsel for the defendants point out that this item covers photostatic and other reproduction costs of literally hundreds of letters, invoices and many different types and kinds of papers for use in this case only. A part of the cost here involved was actually paid Mr. Scofield, counsel for plaintiff, for copies of the Clapper letters that he furnished. Defendants say that when the plaintiff demanded and received large quantities of records taken from the defendant, Original, letters, invoices, purchase orders, shipping notices, etc., photostatic copies were made of those and the cost thereof is here included. Counsel for the defendants say it would be the work of supererogation to list all of the many documents thus copied, even if the court had the time to read such a list. In other words, it would be beyond what is required. The court agrees.

In view of the court's own knowledge of the many, many documents used in the case, and since this is a matter within the court's judicial discretion, and further in view of the oath of defendants' counsel that the item of $207.98 is correct and necessarily incurred in this action, this item of costs will be ordered taxed.

Amount of Item 3 Allowed......$207.98

## Item 4

Docket fees under 28 U.S.C. § 1923—$72.50

Objection is made on the basis that this lump sum item is not broken down. Defendants in their brief say that they filed twenty-one depositions and are charging merely the $2.50 statutory fee per deposition. The remaining portion of the $72.50 item represents the $20 statutory attorneys' docket fee.

In this court no charge is ever taxed by the clerk for filing a deposition. The attorneys' docket fee will be allowed as a part of this item.

Amount of Item 4 Allowed......$20.00

Item 5

Costs incident to taking of
depositions—$1,049.64

■ Quoting the plaintiff, his objection to this item is as follows:

"Most of the items under the heading 'Depositions' reflect disbursements made in 1951 and 1952, and these of course cannot be allowed in view of the court's order of December 14, 1954 requiring the defendants to bear their own costs as to all matters up to that date. Some of these deposition expenses would not be allowable for the further reason that they were discovery depositions not introduced into evidence in the case. Insofar as the amounts reflect disbursements for *carbon copies* of depositions obtained by plaintiff's counsel for their *own convenience* (the original being on file with the Clerk), no allowance for the copy would be proper."

Plaintiff goes on to object to the items of expense covering the depositions of the plaintiff Clapper, and the defendant Williams, and also the expense of the carbon copy of the deposition of McVicar taken at Bloomington, Illinois.

Insofar as the objection is based on the court's order of December 14, 1954, by reason of what the court has previously said in this memorandum, it follows that the objection must be overruled. As to the expense covering the extra copies of the various depositions, the court is firmly of the view that it was not merely convenient for counsel to have them, but it was imperative that they have them. This case, in the experience of the court, stands out singularly. Never before has the court witnessed such vehemence on the part of counsel and the parties. Throughout all the proceedings there has been an absence of the customary trust and professional reliance a court is accustomed to see on the part of counsel. Not infrequently, accusations of misrepresentation, falsification and fraudulence have been leveled by counsel at each other. From their conduct and lack of trust in each other, there should be little wonder as to why they wanted copies of everything, including every statement made during their oral arguments. In this setting and with such a background, the court is of the view that the extra copies of the depositions were reasonably necessary for the use of counsel in this case. This applies both with respect to the pre-trial procedures and in connection with the trial and post-trial procedures. Therefore, the court holds that defendants are entitled to recover the costs incident to the taking of the depositions listed in the itemization of this item of the bill of costs, including one carbon copy. Moreover, the court recalls how often it was required to call upon counsel to brief and argue certain points which necessarily required reference to the various depositions.

The court, although with some reluctance, agrees with the plaintiff in his objections to the costs of the deposition of the plaintiff Clapper taken by the defendants and the cost of the carbon copy of the deposition of the defendant Williams. It is felt that these depositions fall largely within the rule precluding the recovery of the costs of depositions taken solely for the convenience of counsel in the preparation of their case. Consequently, these two items of expense will not be allowed as a part of defendants' bill of costs.

Therefore, as to Item 5 of the bill of costs, the court will allow the following:

1951
___

| | | |
|---|---|---|
| January 18 | Cost of reporting deposition taken 11/10/50 of Lee Flora and Snyder, Danville, Ill. (antitrust) ....................| $ 71.70 |

**1951**

January 18 Cost of reporting depositions
taken 11/28/50 in Kansas City
of Robert D. McCarthy and
Harry Burch (antitrust) ........ 79.49

January 24 Cost of reporting Heller
deposition taken in Chicago
on 11/8/50 (patent infringement)
3 hrs. attendance @ $4 ...$ 12.00
34 pages original @ 70¢ .. 23.80
34 pages carbon @ 30¢ ... 10.20

 46.00

January 24 Cost of reporting Frein
deposition taken in Chicago
12/27/50 (patent infringement)
1 hr. attendance ......... 4.00
8 pages original ......... 5.60
8 pages carbon .......... 2.40

 12.00

February 19 Cost of reporting Alveson, and
others, depositions at Duluth,
11/9/50 (patent infringement) ... 47.66

**1952**

May 19 Cost of reporting Maumee Valley
Seed Co. depositions at Fort
Wayne on 5/14/52 (venue)
Reporter's bill .......... 154.00
Legal services—costs in
obtaining subpoenaes for
witnesses .............. 25.00

 179.00

May 27 Cost of reporting Ruddell and
Morton depositions at Indiana-
polis, 5/15/52 (venue) .... 73.50
2 sets of photostats of
correspondence produced .. 36.54

 110.04

1952

| | | |
|---|---|---|
| September 28 | Cost of reporting McCarthy, Dolan, Bowers and Kimsey depositions at Kansas City 6/25–26/52 (venue) | |
| | Attendance, 8 hrs. @ $3 .. | 24.00 |
| | Notarial certificates ..... | 2.50 |
| | 187 pages original @ 60¢ . | 112.20 |
| | 187 pages carbon @ 20¢ .. | 37.40 |
| | 2 sets photostats of correspondence produced .. | 10.45 |
| | Postage ................ | 1.80 |
| | | 188.35 |

1956

| | | |
|---|---|---|
| December 15 | Cost of reporting McVicar deposition taken at Bloomington, Illinois on 12/13/56 (antitrust) | |
| | Attendance, 3 hrs. @ $5 .. | 15.00 |
| | 35 pages original ........ | 26.25 |
| | 35 pages copy ........... | 8.75 |
| | Postage ................ | .75 |
| | Marshal's fees for service of subpoenas ............ | 18.20 |
| | | 68.95 |

Amount of Item 5 Allowed ....................$803.19

———◆———

## Item 6

### Schedule I. Services, travel and telephone expense of defendant Williams—$27,189.53

This item is made up of expense purportedly incurred by the defendant, Original Tractor Cab Company, Incorporated, and may be broken down into three categories:

(a) The portion of defendant Williams' salary estimated to be chargeable to what are identified as "litigation matters".

(b) Travel expenses of the defendant Williams in connection with such "litigation matters".

(c) Telephone charges for calls also pertaining to "litigation matters".

There is little doubt in the mind of the court that the defendant, Original, did in fact suffer material damage as a result of this litigation. But the defendants had their opportunity during their day in court to establish such damage. They attempted to establish the damage suffered by the corporation, but the court was not convinced by their method and theory. Now is not the time to retry this element of their case. Nor is the taxing of costs of suit the proper means of fixing such damage. For this and the reason earlier set out in this entry, all of Item 6 will be disallowed.

Amount of Item 6 Allowed........$0.00

## Item 7

### Schedule II. Travel and telephone expenses of defendants' attorneys —$3,979.17

 As authority for its objection to this item plaintiff cites Manley v. Canterbury Corp., D.C.Del.1955, 17 F.R.D. 234; Hope Basket Co. v. Product Advancement Corp., D.C.Mich.1952, 104 F. Supp. 444, 451, and Brookside Theatre Corp. v. Twentieth Century Fox, D.C.Mo. 1951, 11 F.R.D. 259. Upon the authority of these cases plaintiff says it is well settled that an attorney's travel and telephone expenses are not allowable. Stated as the general rule, the court would agree.

That this is the general rule is borne out by the weight of authorities. It is only in exceptional and compelling circumstances that courts are prone to depart from the general rule. Gibson v. International Freighting Corp., D.C.Pa. 1947, 8 F.R.D. 487. Such compelling circumstances do not appear in the case at hand. Travel expense of counsel in the preparation of suit and in attending the court proceedings must generally be classified as personal expense. The same is true in respect to long distance telephone expense. Neither of these items can rightfully be classified as "costs of suit." Accordingly Item 7 of the bill of costs is disallowed.

Amount of Item 7 Allowed........$0.00

## Item 8

### Schedule III. Expense for services of defendants' accountant —$4,950.00

 This item represents charges for defendants' accountant in the preparation of defendants' statement of losses and for attending hearings, conferences and trial. Such services were a part of the defendants' detailed preparation and presentation of their counterclaim, and, as such, cannot be allowed as costs. It is true, a part of his time was spent in furnishing plaintiff's accountants with information they needed in making an audit of the defendants' operations.

However, there is no specification in the bill of costs as to how much time was so spent. The court will hazard no estimate. For these reasons Item 8 of the bill of costs is disallowed.

Amount of Item 8 Allowed........$0.00

## Item 9

### Schedule IV. Miscellaneous costs of certified copies of Patent Office records and notary fee —$251.95

All of the charges enumerated in Schedule IV are objected to with the exception of the certified copy of the Clapper file wrapper and interference ($24.55). Plaintiff concedes that the notary fee of $3 may be allowable if identified and shown to be applicable to this case. He also concedes that the defendants may be entitled to a portion but not all of the costs of patent copies ($78.25).

Defendants counter by pointing out that some of the copies of patents were foreign patents and photostatic copies had to be obtained, which increased the cost. A certified translation of the Swiss patent was required. A book of patents was offered in connection with the motion for summary judgment, as well as at the trial. They go on to say that the Alverson file wrapper was made necessary "by the misrepresentation of Plaintiff's counsel with respect to it."

The court was materially aided in making its final determination as to patent validity through the earlier presentation and disposition of defendants' motion for summary judgment. By the time of the trial the court was well acquainted with the history of the prior art in this field.

The court availed itself of the Alverson file wrapper after the dispute arose with respect to the Alverson patent application. It was a necessary part of the record.

As to the file history of the Clapper patent for use of defendants' counsel during trial, in view of the manner in which the interference and concession of

priority were handled as betweeen the applicants, who later were found to be in conspiracy, the court is inclined to believe the extra copy of the history of the Clapper patent was necessary for defendants' counsels' use in the trial. All of Item 9, Schedule IV, will be allowed.

Amount of Item 9 Allowed......$251.95

### Recapitulation of Costs Allowed

| | | |
|---|---|---:|
| Item 1 | Fees of court reporter for all or any part of the transcript necessarily obtained for use in the case | $1,391.49 |
| Item 2 | Fees for witnesses | 31.82 |
| Item 3 | Fees for exemplification and copies of papers necessarily obtained for use in case | 207.98 |
| Item 4 | Docket fees under 28 U.S.C. § 1923 | 20.00 |
| Item 5 | Costs incident to taking of depositions | 803.19 |
| Item 6 | Services, travel and telephone expense of defendant Williams | –0– |
| Item 7 | Travel and telephone expenses of defendants' attorneys | –0– |
| Item 8 | Expense for services of defendants' accountant | –0– |
| Item 9 | Miscellaneous costs of certified copies of Patent Office records and notary fee | 251.95 |
| | Total costs allowed | $2,706.43 |

The clerk will tax the foregoing items of costs against the plaintiff.

It is so ordered.